# AFFIDAVIT IN SUPPORT OF ARREST WARRANT
# FOR STEPHEN HOWARD

I, Task Force Officer Christopher Carver, being duly sworn, deposes and states:

1. I am a Vice/Narcotics Detective with the Auburn Police Division, deputized as a Safe Streets Task Force Officer by the Federal Bureau of Investigation. I have been a police officer with the Auburn Police Division for approximately eleven years. Of those eleven years, I have been a Vice/Narcotics Detective for approximately eight years. I am currently assigned to the Federal Bureau of Investigation (FBI) as a deputized Task Force Officer (TFO). I have investigated criminal violations of state and federal controlled substance laws, including, but not limited, investigations involving smuggling of controlled substances, distribution of controlled substances, forged prescription investigations, the manufacture of controlled substances, as well as the laundering of the proceeds derived from the sale of controlled substances. Additionally, I have been involved in the investigation of violent crime, illegal gambling, animal fighting, violent gangs and organized crime.

2. I have conducted and participated in investigations that have resulted in the seizure of illegal drugs, including, but not limited to, multiple kilogram quantities of cocaine, multiple kilogram quantities of marijuana, quantities of methamphetamine, Methylenedioxymethamphetamine (MDMA), LSD, various designer drugs, and illegal drug proceeds. I am familiar with, and have participated in all of the normal methods of investigation, including, but not limited to, foot, auto, air and electronic surveillance, questioning of witnesses, the use of search and arrest warrants, the use of informants, the use of pen registers, trap and traces, cellular telephone site tracking, mobile tracking devices, the use of undercover agents, and the identification of co-conspirators through the use of drug ledgers, telephone records and bills, photographs and financial records.

3. I am familiar with the ways in which narcotics traffickers conduct their business, including, but not limited to, their methods of importing and distributing narcotics, their use of telephones, cellular telephones and digital display paging devices and their use of numerical codes and code words to conduct their transactions. I have participated in numerous searches, pursuant to consents as well as warrants, for narcotics and other related drug trafficking contraband during my eleven years in law enforcement; in said searches, narcotics, as well as currency, ledgers, logs, books, documents evidencing drug dealing and assets, cellular phones, and other electronic devices (computers, fax machines) have been found.

   ## I. USE OF CONFIDENTIAL INFORMANTS

   Below, your affiant relates confidential source information regarding **Stephen HOWARD**. In providing information gathered from these confidential sources, your affiant herby discloses that some of these informants cooperated with law enforcement in the hope of having state charges reduced or dropped. However, all of these informants are known to your affiant and your affiant has taken steps to corroborate their

information. For CS#1 and CS#2 discussed below, your affiant has no reason to question the truth and veracity of the information provided about **Stephen HOWARD**.[1] Although these confidential informants have not been used by your affiant in the past, your affiant has taken steps to corroborate their information. For example, during previous statements to your affiant, CS#1 provided **HOWARD'S** exact physical address and described his residence as having a fenced in back yard and swimming pool. Due to previous investigations, your affiant knows this information to be accurate. CS#1 described **HOWARD'S** vehicle as a Chevrolet Trailblazer. Due to previous investigation, your affiant knows this to be true. CS#1 stated that **HOWARD** owned as Ruger handgun and sawed-off shotgun. This information has been corroborated by **HOWARD** himself while talking with the UC on May 14, 2015. Furthermore, CS#1 knew that **HOWARD** was an employee of Auburn University. Finally, CS#1 named several individuals that purchased 1,4-butanediol from **HOWARD**. During the course of the investigation, your affiant has corroborated **HOWARD'S** connection with the individuals CS#1 specifically named. Regarding CS#2, you affiant knows that CS#1 and CS#2 are in a relationship and that both CS#1 and CS#2 have interacted with **HOWARD** on multiple occasions. During the course of discussions with CS#2, your affiant has learned the same information and generally the same level of detail as related by CS#1. Your affiant has the same level of confidence in CS#2 and CS#1.

## II. BACKGROUND OF INVESTIGATION

1. On May 5, 2015, your affiant received reliable information regarding **Stephen HOWARD** and his distribution of 1,4-butanediol and possession of firearms in relation to, and in furtherance of, his distribution of 1,4-butanediol. As discussed below, 1,4-butanediol is a controlled substance analogue of Gamma-Hydroxybutyric Acid (commonly known as GHB or a "date rape" drug). **Stephen HOWARD** is an employee of Auburn University, Auburn, Alabama. He is employed as a Lab Technician, Level 4, in the Poly-Fiber Engineering Department at Auburn University, Auburn, Alabama.

2. Based on your affiant's training, experience and knowledge of this investigation, your affiant has determined that 1,4-butanediol is a controlled substance analogue of GHB, Gamma-Hydroxybutyric Acid. Once ingested in the human body, 1,4-butanediol has the same effect on a person's central nervous system as GHB. When ingested, 1,4-butanediol is transformed into GHB by naturally occurring enzymes. GHB is a Schedule I controlled substance and 1,4-butanediol is an analogue of GHB. Being an analogue, 1,4-butanediol is controlled by federal law. In short, 1,4-butanediol is an industrial solvent that has been found to be a depressant and can be used as a "date rape" drug.

3. Your affiant is currently investigating **Stephen HOWARD** for distributing 1,4-butanediol. Your affiant's investigation has determined that **HOWARD** was arrested for a DUI in April 16, 1988, by the Auburn Police Department and subsequently convicted.

---

[1] Your affiant is aware that CS#1 has been convicted of Child Molestation and Enticing a Child for Indecent Purposes.

2

4. On May 6th and 7th, of 2015, your affiant coordinated consensually transmitted text messages in a conversation between CS#1 and **Stephen HOWARD** of Auburn, Alabama. At approximately 2:10 pm, CST, CS#1 transmitted a text message to cellular telephone number 334-524-2064. Your affiant documented these transmitted text messages by photographing both sent and received text messages. Those photographs have been entered into evidence by your affiant. During the conversation, CS#1 requested 20 ounces of 1,4-butanediol from **HOWARD**. **HOWARD** responded by stating that the price would be $10 per ounce. On May 7, 2015, during recorded consensually transmitted text messages, CS#1 and **HOWARD** agreed to conduct the transaction at the Wal-Mart on South College Street in Auburn, Alabama. In addition, **HOWARD** explained in text messages that CS#1 owes **HOWARD** $200.00 for a previous 20-ounce purchase made by CS#1 before CS#1 became a confidential source. The price of the 20 ounces of 1,4-butanediol to be purchased for the controlled purchase was set at $200.00. Therefore making the total amount purchased $400.00.

## II. FIRST CONTROLLED PURCHASE OF 1,4-BUTANEDIOL FROM STEPHEN HOWARD

5. On May 7, 2015, your affiant coordinated a controlled purchase of 1,4-butanediol from **Stephen HOWARD** of Auburn, Alabama. Your affiant directed reliable confidential source #1 (herein after referred to as CS#1) and Alabama State Bureau of Investigation narcotics agent Brandon Blanton, acting in an undercover capacity (hereinafter referred to as the UC), to purchase 1,4-butanediol from, **Stephen HOWARD** in Auburn, Alabama. Your affiant has worked with CS#1 and your affiant has determined that CS#1 has provided information regarding this investigation that your affiant and other law enforcement agents have verified and determined to be true and accurate. At the meet location regarding this controlled purchase, your affiant explained that CS#1 had contacted **Stephen HOWARD** on the 6th and 7th of May, 2015, as described above in paragraph #4. In addition, your affiant explained that during this controlled purchase, CS#1 would attempt to introduce the UC to **HOWARD** so the UC could make the purchase directly from **HOWARD**. CS#1 was searched and the UC was provided with audio/video equipment to document the controlled purchase. The UC was provided buy money to purchase the 1,4-butanediol. CS#1 and the UC departed the meet location and proceeded to the buy location at the Wal-Mart on South College Street in Auburn, Alabama, under constant surveillance. At approximately 8:00 pm, CST, CS#1 received a text message from **HOWARD** explaining **HOWARD'S** exact location in the Wal-Mart parking lot. Specifically, **HOWARD'S** text stated that he was parked next to a red truck. CS#1 and the UC located **HOWARD** parked next to a red truck and **HOWARD** was inside his silver Chevrolet TrailBlazer bearing Alabama License Plate 3595AJ5. Your affiant's investigation has determined that Alabama License Plate 3595AJ5 is registered to **Stephen K. HOWARD** at 55 Lee Road 2149, Auburn, Alabama.

6. CS#1 and the UC approached the passenger side of **Stephen HOWARD'S** silver TrailBlazer, and CS#1 introduced the UC to **HOWARD**. The UC entered the front passenger seat of **HOWARD'S** vehicle and CS#1 returned to the UC vehicle. At approximately 8:10 pm, CST, **HOWARD** asked the UC for the money required to

3

purchase the 1,4-butanediol and the UC provided **HOWARD** with twenty (20) $20.00 bills of U.S. currency. **HOWARD** then directed the UC to open the glove box of **HOWARD'S** vehicle. The UC retrieved a white plastic bag that contained a 20 oz. plastic soda drink bottle. The plastic bottle was full of a clear liquid substance believed to be 1,4-butanediol. The UC explained to **HOWARD** that if the product was good, the UC would want to purchase large amounts in the future. The UC provided **HOWARD** with the UC's name and contact telephone number so they could contact each other for future transactions. Additionally, **HOWARD** explained to the UC that the UC should begin using 5 ml. or approximately half a teaspoon each time the UC uses the 1,4-butanediol. **HOWARD** further advised the UC that the substance was legal to possess and that only the distribution of 1,4-butanediol was illegal.

7. CS#1 and the UC departed the buy location and drove to the meet location under constant surveillance. Once at the meet location, your affiant debriefed CS#1 and the UC. Your affiant and another agent retrieved the audio/video equipment from the UC. The UC turned over the purchased evidence to your affiant.

8. The above described conversation was audio and video recorded. The original compact disk containing the images and audio of the above described controlled purchase has been entered into evidence by your affiant.

9. On May 15, 2015, your affiant turned over the evidence purchased on May 7, 2015, to DEA Special Agent Brian Alfultis at the DEA office in Montgomery, Alabama. SA Alfultis processed the suspected 1,4-butanediol and submitted it to the DEA laboratory in Dallas, Texas, for analysis.

10. On May 19, 2015, your affiant received a report from DEA SA Alfultis regarding the suspected 1,4-butanediol purchased on May 7, 2015. The analysis report from the DEA laboratory in Dallas, Texas, indicates that the evidence purchased from **Stephen HOWARD** on May 7, 2015, is in fact 1,4-butanediol.

III. **SECOND CONTROLLED PURCHASE OF 1,4-BUTANEDIOL FROM STEPHEN HOWARD**

11. On May 14, 2015, your affiant coordinated a second controlled purchase of 1,4-butanediol from **Stephen HOWARD** of Auburn, Alabama. Your affiant directed Alabama State Bureau of Investigation narcotics agent Brandon Blanton, acting in an undercover capacity (hereinafter referred to as the UC), to purchase 1,4-butanediol from **Stephen HOWARD** in Auburn, Alabama.

12. On May 14, 2015, your affiant coordinated consensually transmitted text messages in a conversation between the UC and **Stephen HOWARD** of Auburn, Alabama. At approximately 9:30 am, CST, the UC transmitted a text message to cellular telephone number 334-524-2064. Your affiant documented these transmitted text messages by having the UC forward the text messages to the UC's SBI (State Bureau of Investigation) email. Those emails were subsequently entered into evidence by your affiant. During the

text message conversations, the UC arranged to purchase a gallon of 1,4-butanediol from **HOWARD**. **HOWARD** agreed to the purchase and set the buy location at the Burger King on South College Street in Auburn, Alabama. **HOWARD** and the UC agreed on $1,000.00 for 100 ounces.

13. At approximately 8:00 pm, the UC arrived to the arranged "buy" location. At approximately 8:10 pm, **HOWARD** arrived at the arranged meeting location in his silver Chevrolet TrailBlazer with Alabama Tag No. 3595AJ5. Your affiant's investigation has determined that Alabama License Plate 3595AJ5 is registered to **Stephen K. HOWARD** at 55 Lee Road 2149, Auburn, Alabama. **HOWARD** parked his vehicle and entered the restaurant. **HOWARD** sat down at the booth with the UC and began discussing how the "product" (1,4-butanediol) was moving (referencing the previous 20 FL OZ. bottle the UC purchased on May 7, 2015, as described above in paragraph #-- of this affidavit). **HOWARD** and the UC discussed future prices, if their business continued. **HOWARD** explained to the UC that the UC should be careful with the substance (1,4-butanediol) and even referred to this substance being a "date rape" drug. **HOWARD** explained that if too much was given to an individual, that person would become incapacitated and that person would not know what had happened.

14. During the conversation, **HOWARD** explained to the UC that a Coca-Cola cap is an amount to give someone and refers to a teaspoon being 5 ml which was the dosage amount. **HOWARD** explained that a half teaspoon is for someone who hasn't taken the substance (1,4-butanediol) before. **HOWARD** explained to the UC that this "stuff" makes girls horny and they are all over him and he is 64 years' old. **HOWARD** advised the UC to avoid Montgomery, because there are people there who tend to rip people off.

15. During the conversation, **HOWARD** stated to the UC that the UC was the type **HOWARD** was looking for to do business with and make money without all the hassle. **HOWARD** explained to the UC that if the UC came with the money, **HOWARD** would have the product (1,4-butanediol). **HOWARD** indicated that if things go good then the two could possibly get to a 5-gallon can of substance per order.

16. During the conversation, **HOWARD** explained to the UC that in the past people who have asked about ordering a 5-gallon container complained they were being ripped off when HOWARD explained the 5-gallon container only held 4 1/2 gallons. **HOWARD** then explained to the UC that he had to reassure people, that is how it is sold by the chemical company, totaling 18 liters. **HOWARD** explained to the UC that out of 16 people who have asked about buying a gallon-size container, he (the UC) was basically the only person to buy that amount. **HOWARD** explained that other people who have ordered that amount make the claim that the same stuff could be purchased from the Birmingham area for $500. **HOWARD** explained that the "stuff" coming from Birmingham had been cut and was not in a chemical bottle like the substance (1,4-butanediol) **HOWARD** has.

17. During the conversation, the UC asked **HOWARD** what this substance does. **HOWARD** asked the UC if he had ever heard of GHB. The UC stated that he had heard of GHB. **HOWARD** explained to the UC that once this substance (1,4-butanediol) is consumed,

5

the liver converts the substance into GHB. **HOWARD** explained that once the substance is converted, the person gets high off the GHB. **HOWARD** explained that this chemical cannot be turned into GHB in a lab; it must be done in the body. **HOWARD** then explained to the UC that a similar substance by the name of GBL and how that chemical can be similar but is too inconsistent due to other chemicals needed to create the same effect.

18. During the conversation, **HOWARD** explained that the chemical transformation to that of alcohol in the liver and how once processed a person gets drunk on alcohol. **HOWARD** then explained that the same thing happens with this substance (1,4-butanediol) creating a no inhibitions mood; or if too much is taken, the person just passes out. **HOWARD** then described a schedule for taking the substance claiming this stays in an individual's system for 4 hours. **HOWARD** explained that a dosage should not be taken any closer than 2 1/2 to 3 hours apart. **HOWARD** explained that if the substance (1,4-butanediol) is taken every hour, a person would pass out for approximately 3 hours.

IV. **PROBABLE CAUSE TO BELIEVE THAT STEPHEN HOWARD POSSESSES A "SHORT-BARRELL" SHOTGUN DURING AND IN RELATION TO DRUG-TRAFFICKING CRIMES**

19. During the conversation, the UC and **HOWARD** continued to discuss people **HOWARD** has distributed 1,4-butanediol to and individuals **HOWARD** continues distributing to. **HOWARD** explained that he is not afraid of people; he always carries a gun. **HOWARD** also talked about having a sawed-off shotgun at his residence. **HOWARD** explained to the UC that he named his sawed-off shotgun "nigger cutter"; because if you shot a person in the stomach area, it would cut a person in half. **HOWARD** explained to the UC that if this happened at **HOWARD'S** residence, **HOWARD** would make sure to wait until they got in the house and shut the door so it is all over the door.

20. Further, during the conversation, **HOWARD** discussed CS#1 with the UC. **NOTE:** As previously stated in paragraph #6 of this affidavit, CS#1 introduced the UC to **HOWARD** for the purpose of purchasing 1,4-butanediol. **HOWARD** stated that the individual (CS#1) was no good for business. **HOWARD** also discussed with the UC the possibility of the UC being a Fed (working with the Federal Government as a UC or as a Federal Agent) and how the UC could be setting **HOWARD** up (to be arrested).

21. During the conversation, **HOWARD** began to talk about cutting the substance to a point that no one would ever know. **HOWARD** claims that this substance could be cut with mineral oil. **HOWARD** explained to the UC that he has distilled this substance a "few" times because he is a chemist and that is why he understands this so well. **HOWARD** explained that he had this stuff (chemicals) on his shelf in the chemistry lab and that is how he got started in this. **HOWARD** stated that he is a "water faucet" (1,4-butanediol) in this area and he can cut it off at any time. **HOWARD** made the statement that no one else can get a substance (1,4-butanediol), because a license is required to purchase the substance (1,4-butanediol). **HOWARD** stated that Auburn University has that license. **HOWARD** explained that he purchases the product under the Auburn University license

6

and not under his name. Further, **HOWARD** stated that he purchases this substance (1,4-butanediol) on his credit card. **HOWARD** added that is the only way "they" could trace him to this (the purchase of 1,4-butanediol). **HOWARD** explained that it usually takes three days to ship (1,4-butanediol) to the school, and he makes the purchase over the phone.

22. During the conversation, **HOWARD** explained to the UC that once a person passes out on this substance anything can be done to him/her. **HOWARD** gave the UC examples of beating people up, hanging them upside down, throwing them in the street, and they would not know what was happening. The UC asked **HOWARD** if he had any person pass out like that with him. **HOWARD** responded that he has had 3 or 4 girls pass out on him. **HOWARD** told the UC, "The people there were friends there to visit or there to 'fuck' and they were naked and horny with their clothes off going crazy." **HOWARD** explained to the UC that you will "sit there and stroke it about 3 times" then notice them and then **HOWARD** would ask, "Who wants to fuck a passed out woman?" **HOWARD** explains to the UC that he likes his women to move because it helps him out. **HOWARD** explained to the UC that once the girl passes out he just covers her up on the bed and lets her sleep for like an hour or two. **HOWARD** stated that he has had a girl by the name of "Sxxxxx" pass out once, another girl by the name of "Sxxxx" pass out about 4 times, and a girl by the name "Axxxx" pass out 3 or 4 times.[2] After **HOWARD** stated these names he claims he has had probably 5 different girls pass out on him. **HOWARD** again told the UC that he covers the girls up and lets them sleep it off. **HOWARD** explained to the UC that he has passed out before from this substance. **HOWARD** explained that he and a friend had been up smoking methamphetamine and marijuana and **HOWARD** reached for a drink and took a mouthful of this substance (1,4-butanediol). **HOWARD** explained that he spit the substance out and rinsed his mouth but still passed out and slept for approximately 6 hours. **HOWARD** explained that his friends tried to wake him but could not. **HOWARD** stated that he assumed the substance was absorbed through the gums in his mouth. **HOWARD** explained to the UC to only use this "stuff" around people you know well and trust or by himself. **HOWARD** also explained to the UC that he takes this "stuff" when **HOWARD** is out of marijuana because it helps him sleep. **HOWARD** indicated to the UC that he had another gallon container and for the UC to contact him if anymore was needed.

23. During the conversation, **HOWARD** explained to the UC that the largest container **HOWARD** could order is a 5-gallon container. **HOWARD** said if the UC was to buy six (6) 3-liter bottles, the price for that amount would be $5,000. **HOWARD** then explained to the UC prices by breaking down the price to dollars per ounce amount. **HOWARD** explained that if the UC sold that amount at $10 per ounce, the UC would make $6,000. **HOWARD** recommended to the UC that the UC sell the substance for $15 per ounce. **HOWARD** explained that everyone he sells this substance to sells it for at least $10 per ounce, because it keeps the price strong. **HOWARD** questions the UC to make sure the UC was legit and how the UC has so much money. Once comfortable with

---

[2] Your affiant knows the names of these individuals and is investigating their identities and relationship to **Stephen HOWARD**. To protect their privacy, your affiant has chosen not to use their full names.

7

the UC's response, **HOWARD** explained that he smokes marijuana. The UC then explained that there is no money is marijuana. **HOWARD** then explained that there is money is this substance (1,4-butanediol).

24. During the conversation, **HOWARD** explained to the UC that, at times, people call him in the early morning hours wanting a couple ounces of this product (1,4-butanediol) and **HOWARD** said that amount is not worth getting out of bed and driving to sell $20 worth. **HOWARD** explained if the amount was a 20 oz. bottle for $200 it is worth the trouble.

25. During the conversation, **HOWARD** explained to the UC that **HOWARD** has been looking for a person like the UC to do business with. **HOWARD** explained that if things went well **HOWARD** and the UC could move a lot of product. **HOWARD** indicated he wanted to see if the UC could move a jug or two a week, and if moving that amount of product (1,4-butanediol) was done, money would be made. **HOWARD** explained to the UC that **HOWARD** was not trying to be a king pin and that he could lose his job for doing this, but he would live off of his pension.

26. During the conversation, **HOWARD** indicated that this substance (1,4-butanediol) is being sold for human consumption and to be careful who the UC sold the substance (1,4-butanediol) to because an undercover would bust him (the UC) for this (distributing 1,4-butanediol). **HOWARD** explained to the UC that the UC should only deal with people that the UC trusts. **HOWARD** explained that if people do not pay **HOWARD**, **HOWARD** could sell them Caro syrup. **HOWARD** explained that people he sells to do not check the substance (1,4-butanediol), typically, just shake it and look at the substance. Additionally, **HOWARD** explained to the UC that as long as the two communicated, it would not be a problem getting the product (1,4-butanediol).

27. During the conversation, **HOWARD** explained to the UC that he has a long memory of people and he knows a female from New Orleans who took a computer and phone from him. **HOWARD** explained that this summer he is going to get his computer, phone back and some money from her. **HOWARD** explained that this girl wants **HOWARD** out of her life, but he is going to show up and "fuck that bitch over." **HOWARD** explained to the UC that **HOWARD** knows a way to "fuck" them over where he would not get in trouble, but the girls would remember. **HOWARD** explained methods used by Nazi's when they would shave the head of a woman for humiliation. **HOWARD** explained that these girls could not work without having a wig and that they would remember what they had done. **HOWARD** explained that this is going to happen to one woman in the Montgomery area and one woman in the New Orleans area. **HOWARD** explained that he would use someone like the UC to make a call to the girls to get them into a hotel. **HOWARD** then explained that he would never hit a female, but that he would just shave her head or possibly use an exacto knife and Indian ink, and cut the word "whore" into her and fill that in with the ink. **HOWARD** then explained that he could be a bastard of a person and think of bad things to do, but that doesn't mean he is going to do the acts. **HOWARD** then stated, "Well maybe just a haircut or head shave." At this time, the UC

8

and **HOWARD** left the inside of the restaurant and went to **HOWARD'S** vehicle in the parking lot.

## V. PROBABLE CAUSE TO BELIEVE THAT STEPHEN HOWARD CARRIES FIREARMS DURING AND IN RELATION TO DRUG-TRAFFICKING CRIMES

28. At approximately 8:34 pm, **HOWARD** and the UC entered into **HOWARD'S** silver Chevrolet TrailBlazer. Once inside, the UC handed **HOWARD** $1,000 cash. **HOWARD** counted the cash to ensure the amount was right. After counting the money, **HOWARD** explained to the UC that the substance (1,4-butanediol) was in a backpack in the back of the vehicle and he had to fix it up for the UC. After making this statement, **HOWARD** reached into the center console of his vehicle and indicated to UC that he had a pistol. **HOWARD** then removed a Ruger LC 9 from the center console, removed the magazine, cleared the weapon and handed it to the UC. **HOWARD** then reached into the back of the vehicle and retrieved the substance in a backpack. The substance was in a clear plastic gallon-size bottle container. **HOWARD** showed the UC the label on the container that displayed the name of 1, 4-Butanediol and that indicated the product was 99% pure. **HOWARD** explained that this chemical company manufactures many different chemicals for experimental usage. The approximate time of the transaction was 8:38 pm.

29. The UC then asked **HOWARD** how he usually gives the substance to people. **HOWARD** explained that he usually gives people a half teaspoon, and for those who have been on similar substances, a person could take a whole cap full. **HOWARD** explained that sometimes the person taking the substance does fine and sometimes not. **HOWARD** stated that with the amount of 3cc's, girls are horny and happy. 4cc's they are out (meaning passed out). **HOWARD** explained that the substance has a small swing point, meaning that a person can take a cap full and be fine, but if the person licks the remains in the cap the person could pass out. **HOWARD** said just a little can take you over the edge and that he was trying to educate the UC. **HOWARD** then asked the UC about a girl and if she was a college girl at Auburn?

30. After general conversation, **HOWARD** told the UC that if the two were to continue to do business that the UC should come and "hang out" at **HOWARD'S** residence and bring some girls with him when he came. **HOWARD** indicated that if the UC brought the girls, **HOWARD** would have this "stuff" (1,4-butanediol), some weed (marijuana) and even smoke some meth (methamphetamine) if someone had it. After talking about methamphetamine, **HOWARD** told the UC that **HOWARD** could probably make methamphetamine, but was scared to. **HOWARD** stated he had all of the chemicals in his lab about three months' ago, but got rid of them due to no need for them. **HOWARD** then indicated to the UC that **HOWARD** had some people in the area that may need to buy methamphetamine from him if needed. **HOWARD** again explained to the UC that it would take three days to have the substance sent by Fed Ex to the University. At that time, the UC shut the passenger door and returned to the UC vehicle and **HOWARD** then left the parking lot.

32. The UC departed the buy location and traveled to the meet location and met with your affiant and other agents. The audio/video equipment was retrieved from the UC. The UC turned over the purchased GBL 1,4-butanediol to your affiant. The UC was debriefed regarding the purchase.

33. The above described conversation was audio and video recorded. The original compact disk has been entered into evidence by your affiant.

34. On May 15, 2015, your affiant turned over the evidence purchased on May 14, 2015, to DEA Special Agent Brian Alfultis at the DEA office in Montgomery, Alabama. SA Alfultis processed the suspected GBL (1,4-butanediol) and submitted it to the DEA laboratory in Dallas, Texas, for analysis.

35. On May 19, 2015, your affiant received a report from DEA SA Alfultis regarding the suspected GBL (1,4-butanediol) purchased on May 14, 2015. The analysis report from the DEA laboratory in Dallas, Texas, indicates that the evidence purchased from **Stephen HOWARD** on May 14, 2015, is in fact GBL (1,4-butanediol).

## V. REQUEST FOR NO-KNOCK EXECUTION

36. Based upon the above description of firearms and drug trafficking and **HOWARD'S** stated willingness to use violence, your Affiant requests authorization to execute this arrest warrant at any time in the day or night without announcement – commonly known as a "no-knock" execution of the arrest warrant.

## VI. CONCLUSION

37. Based upon the above, your affiant believes there is probable cause to arrest **Stephen HOWARD** for violations of:

    a. Title 21, United States Code, Sections 813, 841(a)(1), 841(b)(1)(C) (prohibiting the distribution and possession with intent to distribute various controlled substances and analogues);

    b. Title 18, United States Code, Section 924(c) (possession of a firearm during a drug-trafficking crime); and

Christopher Carver
Task Force Officer
Federal Bureau of Investigations

Sworn this the
21st of May, 2015.

_____
WALLACE CAPEL, JR.
UNITED STATES MAGISTRATE JUDGE