IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE MIDDLE DISTRICT OF ALABAMA

EASTERN DIVISION

Case No. 3:15-cr-240-MHT

RECEIVED

2020 JUN 29  A 10: 49

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

STEPHEN HOWARD,
    PETITIONER,
    PRO-SE.

v.

UNITED STATES OF AMERICA,
    RESPONDENT.
_____/

### REPLY TO GOVERNMENTT'S RESPONSES

On June 3, 2020 this Court issued an order (112-1) directing Stephen Howard (HOWARD) to reply the government's responses (109, 111) by June 17, 2020. Howard proceeds as follow.

### EXCUSABLE ERROR

As a preliminary matter HOWARD cites **Haines v. kerner**, [1] for the proposition that PRO-SE litigants pleadings are to be construed liberally and held to less stringent standards than formal pleadings drafted by lawyers. If the COURT can reasonably read pleadings to stated valid claims on which HOWARD could prevail, it should do so despite failure to cite proper legal authorities, confusion of legal theories, poor syntax and sentence construction, or HOWARD's unfamiliarity with pleading requirements. See also **Erickson v. Pardus**, [2]

### TIMELINESS

Because HOWARD have not received the government's responses, he requested to the COURT -on June 11, 2020 (before the June 17 deadline)- a copy of the government's resistance which the Clerk sent to and HOWARD

---

[1] 404 U.S. 519 (1972)
[2] 551 U.S. 89, 94 (2007).

1

received -from prison authorities- on June 15, 2020. HOWARD also had requested 14 days to file his reply. Assuming the Court granted such request in the interest of lady justice and due process, the new deadline would be June 29, 2020.

## COLEMAN-LOW'S MANAGEMENT OF THE PANDEMIC

Recent update of a model -used by the White House- projects 200,000 Covid-19 deaths by October 2020 versus its prior projection of 170,000 deaths by November. A great contributor to that number comes from places where social distancing is almost impossible. Indeed, the statistics now shows that in Europe more than 50% of Covid-19 deaths came from nursing homes while in the U.S. the number is 60%. The CDC realized that threat and identified nursing homes and "long-term care facilities" (such prisons) as groups at high risk.[3]

The BOP took steps to "prevent" the spread of the virus within their facilities and issued a "phase plan" [4] that address "social distancing and treatment of symptomatic inmates". On April 1, 2020 BOP implemented phase Five which current governs operations and aim to "stop **any** spread of the disease" (bold added) by "limit[ing] the movement of inmates [ ] among its facilities" and that ""all official staff travel has been cancelled". It cancelled also social and legal visits, volunteer visits and contractor access and indicates that "newly admitted inmate is **screened for COVID-19 exposure risk factors**" (bold added) also that "asymptomatic inmates with risk of exposure are placed in quarantine for 14 days". In addition, Staff that registers high temperature "are bared from the facility on that basis alone" and Correctional Officers (COs) are "**mandated**" to use mask at all times.

These measures are incredibly critical because an outbreak in an overcrowded facility, such Coleman-Low, not only would impact the inmate population and staff [5] but also the ill-equipped communities surrounding the

---

[3] See CDC, Groups at Higher Risk for Severe Illness, https://**www.cdc.gov**/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html

[4] https://**www.bop.gov**/resources/pdfs/pan_flu_module_1.pdf

[5] Indeed, even Unions have complained and requested release of inmates. "We have very very limited amounts of testing kits" said Brandy Moore, Secretary Treasurer of National Union that represents correctional officers in federal prisons also adding that "our number are not going to be adequate because we're not truly testing them." At FCC Terre Haute, Steve Markle, another leader of National Union who works at that prison said "we have between 2,500 and 3,000 inmates and we were given four tests." In a filling in the E.D.N.Y. on Monday April 13, 2020 the BOP admitted the "shortage of tests". Joe Rojas, a regional union official, complained, "the Justice Department need to be proactive instead of reactive." He said there have already been

2

prison. [6] Thus, by taking these steps, the BOP is aware and acknowledge that the only way the virus come into prisons is through outsiders. Unfortunately, Coleman Low is not in preventing or mitigation mode but promoting the spread of the virus.

**A.** On May 12, 2020 at 8:10 pm COs M. Battisti and B. Daughton were in A1 unit without using a mask. On May 13, 2020 at 11:50 am CO F. Cruz was in the dinning hall without mask even when inmates were picking up their food. The same day but at 12:40pm Unit Manager Ward was in A1 without mask. On May 14, 2020 at 11:48 am CO in charge of food service Diaz was without mask even when the warden was close to him. Same day but at 10pm CO Stewart was coming into A1 unit without mask. On May 15, 2020 at 6:30 am CO M. Mickle in A1 was not using a mask. Same day and same time while inmates went to the kitchen, 5 COs were in front of the Food Service without mask, one of them was CO C. Holt. On May 17, 2020 at 5:45pm CO D. Jones, from food service, did not use a mask. On May 19, 2020 at 7:20 am COs M. Mickle (in A1), J. Gonzales (Outside Food Service), F.Cruz (in the food service) were not using a mask. On May 20, 2020 at 7:00 am CO in charge of the Compound operation J. Gonzales without mask. On May 21, 2020 at 7:00 am COs J. Gonzales, C. Holt and <u>Lieutenant</u> Warren were not using a mask. At 12:17pm, CO Cruz likewise without mask. At 2pm, A1 counselor E. Hadley not using a mask. On June 3, 2020 at 4:30pm, Unit manager Ward not used a mask. On June 6, 2020 CO Eusebio, a similar offender. On June 16, 2020 at UNICOR COs J. Hernandez, A. Perez and S. Clark were not using masks while the entire factory was full with inmates. At 6:10pm COs R. Peavy and Stewart were together outside A1 unit without mask. On June 18, 2020 at 7:15am COs D.Jones, J. Gonzales and 6 more COs not using their masks. At 10:35 am COs J. Clancy (from facility) and Hawkins

---

scares on BOP facilities in Seattle and Miami. Aaron McGlothing, head of the local union at FCI Mendota, California, said "you've got to understand we're in a prison there's nowhere to go," he stressed "if somebody comes down sick, what are you going to do? Everybody's going to get sick." On Friday April 13, the Marshall Project reported Dr. Sylvie Cohen, BOP's chief of occupational and employee health, ordered Oakdale staff back to work the day after they took inmate Patrick Jones (the first BOP's death for COVID-19) to the Hospital. The COs were issued no protective equipment other than latex gloves. Dr. Cohen reportedly directed that 'officer[s] should work unless they showed symptoms.' This advice flew in the face of the CDC guidance, which called for people who have had close contact with a confirmed case of COVID-19 to isolate themselves at home for 14 days. Ronald Morris -President of a local Union at FCI Oakdale whose Warden was removed- has recently filed an imminent danger report alleging negligence and unsafe conditions.

**6** Reducing prisons was so compelling that in an unprecedented move, police chiefs and dozens of current and former top prosecutors (including OHIO former Attorney General James Petro) urged the 6 Circuit Court of Appeals for the release of inmates not just "to protect those in prison, [and] those who work there" but also "those who live in the surrounding community".

(from education) similarly violators. Also, same day, COs from UNICOR S. Clark and J. Hernandez not using masks. On June 20, 2020 CO R. Peavy, not mask as well.[7] All these staff member were and are in constant contact with inmate population and know that the use of mask –according to the CDC and the BOP's own guidance in its so-called "phase" plan- is an effective measure to prevent the spread of the virus. Their actions constitute a deliberate indifference. Compare for instance **Swain v. Junior**, 958 F.3d 1081 at 1090 (11th. Cir. 2020) (per curiam), where the Court indicated that because the prison "mandate[d] that staff [] wear protective masks at all times", the prison's actions **likely** did not amount to deliberate indifference.[8] Coleman low has disregarded time and time again a known risk of not using a "mandatory" mask and turning and blind eye to its own protocols, misleading also to the Courts as to its measures.

**B**. Coleman-Low's plan that dictates that "newly admitted inmate is **screened for COVID-19 exposure risk factors**" and that "asymptomatic inmates **with risk of exposure** are placed in quarantine for 14 days" show again their acknowledgment that the prison is a "ticking time bomb" due that if one gets the virus, it would spread like a wildfire. However, COs D. Jones, F. Cruz and A -Unit Manager Ward have clearly an "exposure risk factor" for COVID-19 because according to the CDC, people with more than 40 BMI (Body Mass Index) are at high risk to contract this highly contagious and deadly virus.[9] Despite this, D.Jones, F. Cruz and Ward keep working day-to-day even, as shown above, without mask.[10]

**C**. Coleman-Low is an open-dorm prison (no cells) with 3 buildings and 6 units housing an average of 2000 inmates. Sinks, showers, bathroom, tv-room, dorms, computer/phone-area, are totally open. BOP says that it relied on guidelines from the CDC in crafting and developing its plan in response to the spread of the virus. Those

---

[7] Although HOWARD is signing this document under penalty of perjury, these facts could also be corroborated not only by hundreds –if not thousands- of inmates but also by security-camera surveillance.

[8] See also See **Phillips v. Roane County**, 534 F.3d at 541 (6th Cir. 2008) (The Court found evidence of deliberate indifference when officials disregarded certain prison protocols )

[9] https://**www.cdc.gov**/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html

[10] If BOP/Coleman-low say that staff showing high temperature "are barred from the facility" then it should be noted that that measure to prevent the spread of the virus in its facilities has been highly criticized not jus by Courts but for experts such as Dr. Homer Venters (an epidemiologist specializing in disease in prisons, that testified in a suit against MDC Brooklyn) who was alarmed about the use of temperature as a measurement to diagnose COVID-19. If someone shows symptoms, it is because he/she has the virus many days before and spreading it

4

guidelines provide that social distancing is "a cornerstone of reducing transmission of respiratory disease."[11] Yet, the BOP multiphase plan does not include a single phase that allow for meaningful social distancing. Coleman-low has not made the effort to even re-arrange the bunks to facilitate social distancing. Compare for instance **Swain, supra** where the 11th Circuit found that the measures took by a jail such as implementing social distancing efforts by changing the position of bunks to maximize social distancing preclude a finding of deliberate indifference. HOWARD is housed in a 3-men cubicle.

**D.** Coleman-low's procedure for a symptomatic inmate is to put him in "administrative medical-transfer" and then move him (for segregation) to Coleman-Medium (a few yards from the Low) with other symptomatic prisoners and once he "recovered" then come back to Coleman-low. If the inmate test positive and sent to the hospital or die, then that COVID-19 death count for the medium, not for Coleman-low. This scheme was made to cook the numbers of new infections in the Low facility and make the medium with more ones[12]. Also, given the transit status of these inmates, keeping tracking is hard for the general public. To know the real number of coronavirus cases in Coleman-low, a general testing should be accomplish keeping in mind that the result would be astonish if we consider Florida Governor's June 16 statement regarding the infection rate in a Florida county jail that count 63% Covid-19 positives.[13] Coleman Low's numbers then would reflect more than 1100 cases showing that its "protective measures" is not to prevent or mitigate, but to promote widespread transmission of the virus. Hence, Coleman-low failures left inmates, staff and the surrounding communities in a perilous situation by facing a "death trap" especially when recent updates show the increase of FLORIDA's COVID-19 new cases making Florida the 3rd state with more cases where even sparked the reaction of New York, New Jersey and Connecticut to issued a quarantine order for travelers coming from Florida.

Indeed, on June 17, 2020 Florida registered 3,200; on June 18, 2020 3,800 and on June 19 more than 4,000 new Covid-19 cases. Considering this data, analysts project that Florida would be the next "hot spot" or it is already

---

[11] https://**www.cdc.gov**/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf

[12] Because of public safety, Inmates in Low facilities have more chances to get compassionate releases than Medium's inmates.

[13] In addition, in an Ohio state prison, a massive –thousand-testing was made, so, if testing for asymptomatic inmates has been made in States prisons which have well less budget than its Federal counterpart, then why Coleman-low is not doing it?

5

one[14].

**E.** Coleman-low proudly show that it has isolated the buildings-units in order to avoid cross-contamination. The effort however is inconsistent and fruitless because inmates (from different units) work in the food service, laundry and commissary usually without mask, an issue that could be corroborated by security cameras. In fact, Coleman-low encourage inmates gathering from different units in the medical department. **See Exhibit A.**

### COLEMAN-LOW'S DELIBERATE INDIFFERENCE AND MISLEADING TO THE COURT

On June 18, 2020 Florida had 3,207 new Covid-19 cases; On June 19 it had 3,800 new ones, reporting more new cases than the whole Europe Union in a single day[15]. On June 20, Florida showed 4,000 new cases and on June22, it already passed more than 100, 000 total Covid-19 cases. Florida also reported 3,173 COVID19 deaths and the curve is ascending. In this context, and learning from the experience at FCI Elkton and FCI Oakdale[16], Coleman-Low is in the path to become the next petri dish or warzone in Florida with catastrophic consequences to the closest communities. Coleman-low's lack of enforcement actions with its own staff show not only inconsistent efforts to reduce the risk of spreading in-and-out of prison and taking the risk of COVID-19 not seriously but also that Coleman-low is misleading to the Court about its "measures"[17]. The subjective mental-state component of the 8 Eight Amendment in this case is more than clear blameworthy of deliberate indifference. See generally **Kurapati**[18] (finding that district court had subject matter jurisdiction over the claims raised in complaint because government

---

[14] In an interview in CNN on 6.24.2020 at 8am Rebecca Jones , a former Florida Health Employee who was in charge of tracking Covid-19, stated that Florida does not register COVID-19 deaths if the person was a Florida non-resident. She argued that if the person got the virus in Florida and died in Florida then it should be count. She also indicated that Florida is misleading about new cases and deaths.

[15] CNN on 6.19.2020 at 5:30pm.

[16] FCI Elkton (a low-security prison in Lisbon, Ohio, where coronavirus erupted early. The prison granted early release to only six of its 2,300 inmates through May 8. Nine inmates there have died of COVID-19) and FCI Oakdale (in Louisiana, whose Warden was removed) are two of the hard-hit BOP's facilities which the BOP was highly criticized even by the Attorney General.

[17] In another example of BOP and its facilities misleading to the public, on May 3 2020, BOP's website conspicuously showed that MDC Brooklyn and MCC New York have not reported inmates with COVID-19. In a court filing that same day, however, the Wardens told the U.S. District Judge that they had 11 confirmed cases.

[18] **v. U.S. Bureau of Citizenship & Immigration Servs.**, 775 F.3d 1255, 1262 (11th Cir. 2014) .

6

agency failed to follow its own regulations); See also **Richmond**[19] ( finding that because the doctor took no action to ensure the treatment plan was being followed, the Court held that a jury could find the doctor was deliberately indifferent to defendant's medical needs); **Phillips**[20] (The Court found evidence of deliberate indifference when officials disregarded certain prison protocols ).

Coleman-low could show to the Court about its low Covid-19 cases in its facility, however, the widespread of the virus in Florida raise the valid question of "when" rather than "if" the virus will get into the prison given not only that Coleman-low is not an isolated island or planet but also its deliberate indifference. Coleman-low's "nothing to see here" is a hopeless defense.

As noted in **Fraihat**[21] , "the constitution protect those in detention against a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year" (citing **Helling**, 509 U.S. at 33 ("it would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them").

As Orlando Congresswoman Val Demings a former Orlando police chief told the Florida Phoenix, all inmates deserve to be treated as well as Paul Manafort and Michael Cohen but they aren't. Both made 40% of their sentence.

## HOWARD'S PARTICULAR CONDITION

Public safety of course is a natural concern for the release of inmates. In 2018 Congress passed the First Step Act (FSA) which granted the DOJ millions of dollars to, among other, assess inmates' recidivism level. The DOJ and BOP then built a sophisticated and reliable tool called PATTERN which –after a period of feedback from Judges, Public defenders, Prosecutors, Psychologist, and so on- determined inmates' risk level for committing future crimes. This tool has 4 levels: minimum, low, medium and high. HOWARD has been assigned minimum recidivism risk. This assessment contrast with the prosecutor's position that HOWARD "still poses a significant danger to the safety of the community" (109, page 17).

---

[19] **v. Huq**, 885 F.3d 928 (6th Cir. 2018).
[20] **v. Roane County**, 534 F.3d at 541 (6th Cir. 2008)
[21] **Fraihat v. U.S. Immigration and Customs 2020** U.S. Dist. Lexis 72015, 2020 WL 1932570,*2 (C.D. Cal. Apr. 2020)

7

HOWARD was sentenced to 102 months and accounting for good-time credit(15%), the effective time sentence is 86.7 months which HOWARD has served 60 months so, he has 26.7 months time left. In the alternative, HOWARD is legible for the First Step Act which indicate that elderly inmates has to serve 2/3 of their time, this means, HOWARD has to serve a total of 68 months so he has 8 months time left.[22] Although the prosecutor is aware of this, he represented to the Court that HOWARD intent "to shave 42 months off his imposed sentence". (109, page 18)

HOWARD's undisputed medical issues –which are risk factors for COVID-19- give little doubt that the he will suffer irreparable harm of the increased likelihood of severe illness or death if he is not granted early release or reduce his sentence. The equities and public interest support such finding. In fact, the government conceded that "Coleman-low is not taking additional, special steps specific to [protect] HOWARD" (109, page 3 at footnote). See **U.S v. Brown** 2020 U.S. Dist. Lexis 87133 (S.D. Iowa, 2020) ("These [underlying medical conditions] can have devastating and life-threatening consequences for a person infected with [COVID-19]" ) at 2020 U.S. Dist. Lexis 7. "Already 'tinderboxes for infectious disease', prisons now are even more dangerous than we typically accept". Id. at U.S. Dist. Lexis 5 citing **U.S. v. Rodriguez**, No. 2:03-cr-00271-AB-1, 2020 WL 1627331, at *1 (E.D. Pa. Apr. 1, 2020). "The risk of death are even higher for someone housed in a closed population such as prison and especially high for [HOWARD] given his medical history and presentation. Not every inmate is at serious risk. [HOWARD] is an exception" Id. lexis 7.

## CONCLUSION

HOWARD respectfully requests to reduce his sentence to time served and begin his supervised release or in the alternative to reduce his sentence and be sent to home confinement.

---

[22] The House of Representatives has passed an ACT, yet to be approved by CONGRESS that the 2/3 has to consider the good time credit. This means, considering the good time, HOWARD sentence would be 86.7 months and the 2/3 of that is 57.8 months. HOWARD already did 60 months.

8

**CERTIFICATE OF SERVICE**

I HEREBY certify that on June 25, 2020 I sent a true and correct copy of the foregoing with the CLERK of the Middle District of Alabama, which will send a notice of filling to all parties and serve a copy upon the following via electronic filing to:

>Louis V. Franklin, Sr.
>Assistant United States Attorney
>131 Clayton Strett
>Montgomery, Alabama 36104

**DECLARATION**

*Stephen Howard*
*June 25, 2020*

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and memory.

>STEPHEN HOWARD
>Reg. 15668-002   A1 unit
>Federal Correctional Institution Coleman-low
>P.O. Box 1031
>Coleman, Florida 33521

*Stephen Howard*
*June 25, 2020*

9