IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, EASTERN DIVISION

UNITED STATES OF AMERICA    )
                            )    CRIMINAL ACTION NO.
      v.                    )      3:15cr240-MHT
                            )          (WO)
STEPHEN HOWARD              )

OPINION

This matter is before the court on defendant Stephen Howard's motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A). He seeks compassionate release from incarceration due to his advanced age and health conditions, several of which place him at a significantly elevated risk of serious complications and even death should he become infected with COVID-19, and his inability to protect himself from infection in the prison where he is incarcerated. The court has struggled with the issue and concludes, after consideration of evidence presented at an evidentiary hearing on August 11, 2020, and a careful review of the entire record, that the motion should be granted.

## I. BACKGROUND

In 2015, Howard pleaded guilty to three counts of possession with intent to distribute 1,4-butanediol, one count of brandishing a firearm during and relation to a drug trafficking offense, and one count of simple possession of methamphetamine. He was sentenced to 102 months in prison. This sentence consisted of 18 months of imprisonment on the three 1,4-butanediol counts and 12 months on the methamphetamine count, all to run concurrently, plus a consecutive 84 months on the brandishing count. The court also sentenced him to three years on supervised release.

Howard has been incarcerated since May 22, 2015. As of today, he has served 64 months, or approximately 63 % of his total sentence. His current projected release date is August 18, 2022, which would give him an actual total sentence of about 88 months. When looked at in this light, he has served approximately

2

73 % of his sentence.  If one further considers that he likely would be released to a halfway house six months before his projected release date, he has about 17 months left to serve in a prison setting.

Howard is of advanced age--69 years old--and has several serious health problems.  He suffers from severe Type II diabetes with complications, obesity, hypertension, and high cholesterol.  It is undisputed that people in his age group and those with diabetes and obesity are at elevated risk of severe illness or death from COVID-19, and that people with hypertension may be at elevated risk as well. *See generally* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-increased-risk.html (accessed on August 26, 2020).

The prison where Howard is incarcerated, Coleman-Low Federal Correctional Institution, has been experiencing an outbreak of COVID-19.  When Howard first filed his motion in April 2020, the Bureau of Prisons (BOP) reported few cases in the facility.  By

3

July 17, the reported numbers had increased to 45 infected inmates and 11 infected staff. https://www.bop.gov/coronavirus/ (accessed and screenshot taken on July 17, 2020). As of July 27, the reported number of infected inmates had more than tripled to 169 inmates infected, the number of infected staff had almost doubled at 18, there were no deaths, and three inmates and two staff had recovered. https://www.bop.gov/coronavirus/ (accessed and screenshot taken July 27, 2020). On August 24, 2020, the BOP showed 162 infected inmates, 20 infected staff, one inmate death, and 62 recovered inmates and three recovered staff. *Id.* (accessed and screenshot taken August 24, 2020). As of September 16, 2020, Coleman had 94 infected inmates--an improvement, but still a significant outbreak.

## II.  LEGAL STANDARD

Howard seeks compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A), which authorizes a court to

**4**

modify a term of imprisonment in certain enumerated circumstances.  As relevant here, it states:

> "[T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
>     (i) extraordinary and compelling reasons warrant such a reduction ...
>
>     and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission."

18 U.S.C. § 3582(c)(1)(A).  Congress did not define the phrase "extraordinary and compelling" in the statute and instead directed the United States Sentencing Commission to describe which circumstances qualify. *See* 28 U.S.C. § 994(t).

The "applicable policy statement" with which relief under § 3582(c)(1)(A) must be consistent is found in

Guideline 1B1.13 of the United States Sentencing Guidelines. *See* U.S. Sentencing Commission, 2018 Guidelines Manual (hereafter "U.S.S.G."), § 1B1.13(2). Guideline 1B1.13 mirrors § 3582(c)(1)(A) in that it provides that a court may reduce a term of imprisonment if the court determines that "extraordinary and compelling reasons warrant the reduction" and that the reduction is consistent with the policy statement, but it also requires that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2). In an application note to the policy statement, the Sentencing Commission provides the following categories of "extraordinary and compelling circumstances": (A) a medical condition of the defendant, (B) the advanced age of the defendant, and (C) the defendant's family circumstances. U.S.S.G. § 1B1.13 cmt. n.1. The medical conditions that qualify include a terminal illness, U.S.S.G. § 1B1.13, comment n.1(A)(i); and a serious physical or medical condition,

serious functional or cognitive impairment, or aging related deteriorating physical or mental health "that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover," U.S.S.G. § 1B1.13, comment n.1(A)(ii). The Commission also included a 'catchall' provision where the Director of the BOP finds "other reasons" exist that are "extraordinary and compelling." U.S.S.G. § 1B1.13 cmt. n.1(D).[1]

As the government recognizes, "[i]f an inmate has a chronic medical condition that has been identified by the CDC as elevating the inmate's risk of becoming seriously ill from COVID-19,[] that condition may

_____

1. Although the catchall provision gives authority to the BOP alone to determine whether "other reasons" warrant release, this policy guidance has not been updated since the 2018 passage of the First Step Act, Pub. L. No. 115-391. This court has concluded that, regarding any inconsistency between the statute and the policy statement, the policy statement serves as guidance but does not limit the court's authority. *See United States v. McCall*, No. 2:18CR95-MHT, 2020 WL 2992197, at *2 (M.D. Ala. June 4, 2020) (Thompson, J.); see also id. at *2 n.2 (citing many cases reaching the

satisfy the standard of 'extraordinary and compelling reasons.'"  Govt. Resp. to Show Cause Order (doc. no. 109) at 16.  Specifically, "under these circumstances, a chronic condition (i.e., one 'from which [the defendant] is not expected to recover') reasonably may be found to be 'serious' and to 'substantially diminish[] the ability of the defendant to provide self-care within the environment of a correctional facility,' even if that condition would not have constituted an 'extraordinary and compelling reason' absent the risk of COVID-19." *Id.* (citing U.S.S.G. § 1B1.13, cmt. n.1(A)(ii)(I)).

Prior to the First Step Act of 2018, Pub. L. No. 115-391, only upon motion of the BOP could a court consider releasing a defendant under 18 U.S.C. § 3582(c)(1)(A).  Now, after the Act, prisoners may file their own motions without the BOP's support provided that they have either "fully exhausted all administrative rights to appeal a failure of the Bureau

---

same conclusion).

of Prisons to bring a motion on [their] behalf" or 30 days have lapsed "from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."  18 U.S.C. § 3582(c)(1)(A).

## III. DISCUSSION

After careful consideration of the entire record, including listening to the recorded interactions between Howard and the government that underlay his convictions, the court finds that Howard has met the requirements of § 3582(c)(1)(A) and should be released.

At the August 2020 hearing on the motion, the government conceded that Howard has met the exhaustion requirement because 30 days have lapsed from the warden's receipt of his request for compassionate release.  *See* 18 U.S.C. § 3582(c)(1)(A).  Therefore, the discussion below focuses on the substantive merits of his motion.

First, the court finds that Howard's age of 69 combined with his diagnoses of severe diabetes,

obesity, and hypertension, in the context of the current outbreak of SARS-CoV-2 at the Coleman-Low facility, presents "extraordinary and compelling" reasons for release under § 3582(c)(1)(A). In particular, the court finds that these chronic conditions substantially diminish his ability "to provide self-care within the environment of a correctional facility," that is, to take the steps a free person could to protect himself from infection. U.S.S.G. § 1B1.13, comment n.1(A)(ii). The Centers for Disease Control has warned that advanced age, obesity, and Type II diabetes increase an individual's risk of severe illness from COVID-19, and that hypertension may increase that risk. *See generally People at Increased Risk,* Centers for Disease Control, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-increased-risk.html (last visited Sept. 2, 2020). Defense expert Dr. Alejandro Diaz credibly testified at the evidentiary hearing that the combination of Howard's advanced age and his medical

conditions puts him squarely in the group with the worst prognosis should he be infected with the coronavirus. Indeed, according to Dr. Diaz, Howard's age and medical conditions multiply by several times his risk of serious illness and even death from COVID-19.

Dr. Diaz also credibly opined that the conditions in which Howard is living are not safe for him. Howard testified that the L-shaped building in which he lives houses about 150 inmates. There are rows of two-man cubicles running down both side of each part of the "L," and in the center of each wing, there is a row of three-man cubicles. Howard is housed in an approximately eight-by-ten-foot three-man cubicle, where he sleeps in a bed approximately two feet from a bunk bed where his two roommates sleep. The only thing that separates him from in the next cubicle is a 64-inch divider wall, and there is a bunk bed positioned directly on the other side of the wall next to which he sleeps so that the breath of the inmate on

the top bunk can fall directly on him.  While all inmates are issued cloth masks, use by inmates and staff has been inconsistent but improving, and staff encourage inmates to use them mostly when prisoners are in the common areas and during count.  Dr. Diaz testified that, while the cloth masks are helpful, they will not prevent infection in people living in such close proximity to each other.  He made clear that the most effective way to stop transmission is testing, and that based on the medical records, Howard had not been tested.  Based on Howard's testimony, it appears that, in his unit, only symptomatic inmates and their cubicle-mates have been removed from the unit and tested.

The government argues that Howard's medical conditions do not constitute "extraordinary and compelling reasons" for release because the Coleman facility is equipped to provide medical care for chronic health conditions, because of the precautions the facility has taken to avoid infection, and because

the majority of infections at the facility have been in a separate women's dorm.  The court disagrees.  First, the prison's ability to provide standard care for chronic conditions does not mean that it is equipped to provide necessary care for serious complications of COVID-19, or to protect Howard from infection.  Second, as Dr. Diaz testified, the precautions the prison is taking are insufficient to protect Howard, given his advanced age and health conditions.  The prison has put prisoners in lockdown, limited visitors, provided and encouraged the use of cloth masks, and begun taking prisoners' temperatures every day.  While these measures are steps in the right direction, they are insufficient for Howard.  Cloth masks will not prevent infection when in the close and extended presence of someone with the virus, Dr. Diaz testified.  And, while taking temperatures is better than nothing, it is plainly insufficient.  The problem is that more than 50 % of infected people--closer to 80 % according to one study Dr. Diaz cited--will be entirely asymptomatic

13

yet still capable of spreading the virus.  Therefore,
in Dr. Diaz's view, taking temperatures amounts to
little more than public relations.  Dr. Diaz testified
that the best way to prevent infection is through
widespread testing--something the BOP has not done in
Howard's unit.  The fact that most of the infections
have been in the women's dorm does not mean that Howard
is safe, given the highly communicable nature of the
disease, and Howard's credible testimony that about 12
ill inmates and cubicle-mates have been removed from
his unit and have not returned.  For these reasons, the
court also finds that Howard will be safer if released
to live in the Auburn area in an apartment or hotel
arranged by his family.

The far more difficult issue in this case is the
application of the factors in 18 U.S.C. § 3553(a) to
the decision whether to grant a sentence reduction.
The court has struggled with whether a reduced sentence
would be sufficient given Howard's offenses.  Howard
sold 1,4-butanediol, a chemical that is converted into

Gamma Hydroxybutyrate (GHB), a central nervous system depressant that can render a person unconscious and has been referred to as a "date rape drug," although it apparently is used recreationally as well by people who want to get high. Howard insists that it was not his intent that the drug be used to render people unconscious, and that he was introduced to it and sold it primarily to women who worked as prostitutes who used it to get high and lower their own inhibitions. He also admitted to taking it himself.

During the evidentiary hearing on the motion, the court was under the impression that, during a conversation with an undercover agent, Howard had advocated that one could use the drug to sexually assault people. Howard insisted that, in this discussion, he was attempting to warn the undercover about what could happen if someone were to take too much of the drug. Upon carefully listening to the full recording, the court is now convinced that its first impression was incorrect and that Howard actually was

15

attempting to warn of the impact of using an excessive amount of the drug and was telling the agent how much should be used to get high without passing out. Indeed, a government witness at the sentencing hearing testified to the same. *See* Sentencing Transcript (doc. no. 124) at 40.  On the other hand, it is clear that Howard was willing to sell large quantities of the drug to the undercover agent knowing that he planned to sell it to others, and with no assurance that it would not be used to incapacitate unsuspecting victims.  This is a serious offense.

However, the balance of factors weighs in favor of reducing Howard's sentence.  During his over five years of incarceration, Howard has had no disciplinary infractions, has worked consistently in the UNICOR and education programs, has completed a 120-hour drug treatment program, and has been assessed by the BOP as having a "minimum" risk of recidivism. *See* 18 U.S.C. § 3553(a)(1); § 3553(a)(2)(C).  He had no criminal history prior to the current offense other than a

**16**

driving under the influence charge many years earlier.
*See id*.  As discussed earlier, he has served well over
half of his sentence.  *See* § 3553(a)(2)(A) & (B).  His
adult daughter has committed to obtaining a place for
him to live, and he has a means of supporting himself
outside of prison, as he will be receiving social
security.  *See* § 3553(a)(2)(C).

Furthermore, Howard has already completed the
18-month portion of his sentence related to his drug
sales.  The vast majority of his sentence is based on
his conviction for brandishing a weapon during or in
connection with a drug trafficking offense: he received
the mandatory-minimum consecutive sentence of 84
months.  However, the evidence shows that, while he was
guilty of the brandishing offense, the underlying
conduct was not particularly serious.  It occurred when
Howard and the undercover agent got in Howard's car to
consummate the sale of drugs, after a lengthy
conversation in a restaurant.  While sitting with the
undercover officer in his car and immediately before

reaching into the back of the truck to retrieve the drug, Howard took his handgun out of the center console, unloaded the ammunition, and handed the agent the weapon, explaining in a friendly tone that it was considered a "micro-gun" because of its size.   These facts do not place this offense within the realm of the most serious brandishing offenses, in which the gun is used in a clearly threatening manner.   Because the brandishing offense here was relatively minor, a sentence reduction is acceptable here.   *See* § 3553(a)(1) (requiring consideration of "the nature and circumstances of the offense"); § 3553(a)(1)(2)(A) (requiring consideration of "the need for the sentence imposed ... to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense).

At sentencing, and during the evidentiary hearing on the now-pending motion, the court was disturbed by evidence that Howard had, during a conversation with the undercover officer, talked about his desire to harm

two women he felt had wronged him.[2]   However, after
carefully listening to the recording, the court
realized that it had not received a completely accurate
picture of this conversation.  During the conversation,
Howard expressly stated that he did not believe in
violence against women and had never hit a woman, other
than once spanking his daughter. He also concluded his
disturbing statements about what he would like to do to
the women by saying that he would not really do it, and
that at most, he would give them a too short haircut.
The court is convinced that he was likely simply
puffing and/or blowing off steam.

Admittedly, this motion presents a close call.
Howard's sale of 1-4-butanediol was unacceptable,
especially given the risk that it could be used against
unsuspecting people.  That said, at the time of his
offense, he was engaged in significant substance abuse,
which likely contributed to his behavior.  Based on his

---

2. There is also evidence in the record that Howard
harbors racist attitudes.  However, such attitudes are
not criminal.

having already served over five years in prison, his having only 17 months left to serve before release to a halfway house, the details of his offenses, his extreme vulnerability to serious complications and even death should he become ill with COVID-19 during the remaining 17 months of incarceration, and the failure of the BOP to provide him with adequate protection from infection in spite of his vulnerability, the court concludes that the balance of the § 3553(a) factors weigh in favor of release.

The court also finds that Howard "is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2). Section 3142(g) sets forth factors courts must consider in deciding "whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community." These include, among others, "the nature and circumstances of the offense charged; ... the history and characteristics of the

person; ... [and] the nature and seriousness of the danger to any person or the community that would be posed by the person's release." *Id*.  As discussed earlier, Howard is now of advanced age, 69 years old, and has significant health problems.  He has no history of violent behavior.  He has family willing to provide him with a place to live and a retirement income. While Howard was convicted here of a serious drug offense and a gun offense, he has otherwise lived a law-abiding and productive life, with the exception of a long-ago driving-while-intoxicated offense.  His offenses occurred during a period in which he was involved in significant substance abuse, but he has since completed substance-abuse treatment, and, if released, will be under supervision and drug-testing for years, so there is little chance he will fall back into using drugs.  And, as discussed earlier, his talk of violence appears to have been more smoke than fire. In sum, the court is convinced that, if released, he will not pose a danger to community.

## IV. CONCLUSION

After considering all relevant factors and the Sentencing Commission's policy statement, the court finds "extraordinary and compelling reasons" exist to reduce Howard's sentence to time served.  However, due to the nature of his underlying conduct, the court will convert the remainder of his prison sentence to an additional sentence of supervised release with home confinement and electronic monitoring.  Furthermore, Howard may need to undergo a 14-day quarantine before being released from prison.  The court will hold a conference call forthwith with the parties to discuss his exact release date.

An appropriate order and judgment will be entered after the call.

DONE, this the 22nd day of September, 2020.

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE